IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| First Star Logistics, LLC, | : | Case No. 1:16-cv-1070 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Michael R. Barrett |
| v. | : | |
| | : | |
| Justin Bernard, *et al.*, | : | Order |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Matson Logistics Services, LLC (Doc. 41), the Motion for Summary Judgment filed by Defendants/Counterclaimants Justin Bernard and Bernard Global Enterprises (Doc. 42), and the Motion for Partial Summary Judgment filed by Plaintiff First Star Logistics, LLC (Doc. 51). For the reasons that follow, Matson Logistics Services, LLC's Motion will be **DENIED**; Bernard's and Bernard Global Enterprises's Motion will be **DENIED**; and First Star Logistics, LLC's Motion will be **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

First Star Logistics, LLC ("First Star") is a third-party logistics servicer that manages motor carrier brokerage services, freight forwarding services, warehousing, and supply chain management and transportation services. Defendant and Counterclaimant Justin Bernard began performing work for First Star as a sales agent in 2013, although the terms of the arrangement are in dispute. In March 2016, Bernard left First Star and began working for competitor commodities transportation service company, Defendant Matson Logistics Services, LLC ("Matson"), bringing with him clients from First Star. This litigation ensued.

### A. The First Sales Agent Agreement

On September 5, 2013, First Star and Bernard signed a Sales Agent Agreement (the "First Agreement"). (Doc. 4-1 at PageID 172–188.) The Agreement incorporates three attachments labeled Exhibit A, Schedule A, and Exhibit B. However, the First Agreement entered into evidence by First Star is undisputedly missing Page 6 of Schedule A, and the parties dispute what was contained on that missing page.

The First Agreement designates Bernard as an independent contractor authorized to market, sell, and provide the products and services of First Star. (*Id*.) The agreement is for a term of five years, termination of which must be in writing only under certain conditions, including by agreement of the parties or by the agent for failure to pay commission after the agent gives notice. (*Id*. at PageID 177.). The agent's compensation is by commission "as specified on Schedule A hereto." (*Id*. at PageID 175.) Illegal and unenforceable provisions are severable. (*Id*. at PageID 180.) Finally, the agreement is to be the entire agreement, and "[n]o modification of this Agreement will be effective unless in writing and signed by both parties." (*Id*. at PageID 179.)

Exhibit A to the First Agreement is a five-page Agreement Regarding Confidentiality, Non-Solicitation and Non-Recruitment between Bernard and First Star. In relevant part, it states:

**1. Non-Solicitation**. The Agent agrees that during the term of the Sales Agent Agreement, and for a period of 365 days following the termination of the Sales Agent Agreement for any reason, the Agent (including its owners, employees, officers, directors, and representatives) will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of the Company, solicit business, or attempt to solicit business, in products or services competitive with products or services sold by the Company, from (a) any customer or client of the Company, or (b) any prospective customer or client with whom the Agent dealt or solicited during the sorter of (i) the period between the commencement of the Sales Agent Agreement and the termination of the Sales Agent Agreement in

2

accordance with its terms and (ii) the 12-month period immediately preceding the
termination of the Sales Agent Agreement for any reason.  Subject to the terms and
conditions of the Sales Agent Agreement, this Non-Solicitation provision will not apply
to those customers listed on Schedule B.

(*Id*. at PageID 185.)  The parties agreed that certain accounts are "excluded" from provisions of

the agreement and are detailed in Schedule B to the Sales Agent Agreement.  (*Id*. at PageID

187.)  Finally, the parties again agreed the agreement was the "entire" agreement and could not

be amended or waived except by a writing signed by both parties.  (*Id.* at PageID 187.)  The First

Agreement contains signature lines and signatures for Todd Hammerstrom, Manager of First

Star, and Bernard in two places: on page ten of the Sales Agent Agreement and page five of

Exhibit A.  (*Id*. at PageID 181, 187.)

Page 6 of the First Agreement is missing from evidence.  The words, "Schedule A," to

the First Agreement are printed at the bottom of page 5 of Exhibit A following the second

signature blocks.  Although it is designated in the Sales Agent Agreement as the commission

table, it is missing any language below the heading.  (*Id*. at PageID 176, 187–88.)  Instead, the

First Agreement jumps from page 5 to page 7, which contains Schedule B, defining Excluded

Accounts from the Agreement Regarding Confidentiality, Non-Solicitation, and Non-

Recruitment.[1]  (*Id.* at PageID 187–88.)[2]

**B.  The Second Sales Agent Agreement**

The parties dispute whether the Sales Agent Agreement contained a third signature block

and a waiver of non-solicitation provisions on the missing Page 6.  A second version of First

Star's Sales Agent Agreement is in evidence (the "Second Agreement") (Doc. 4-2 at PageID

---

[1] No accounts are listed as excluded.  (*Id*. at PageID 188.)
[2] Also included is a W-9 form dated September 12, 2013.  (*Id*. at PageID 182.)

189–205; Bernard Deposition Exhibit 2, Doc. 49-1 at PageID 2536–2552).  The Second

Agreement appears identical to the First Agreement, but it is unexecuted by First Star in the two

signature blocks.  In addition, this version includes the missing Page 6 of Schedule A.  Page 6 in

this version includes Bernard's commission rate, two handwritten paragraphs, Bernard's

signature and initials, and the signature of First Star Senior Account Broker, Rob Hendricks.

Page 6 reads:

### Sales Commissions

The following sales Commission, as defined and calculated in this Agreement, will be **65**% for the term of this Agreement unless otherwise determined by the terms of this Agreement.

_____ Initials – FSL
___JB__ Initials – Agent

After a month we will re-evaluate percentage based on margin upon reaching above average margin (12%) I will be raised on my [sic] commisions up to 70% based on the amount of profit.

[signature]

This is not a non-compete contract.  I am at will to leave with any customers at any moment if I feel it is in my best interest.

(Doc. 4-2 at PageID 204.)

At his deposition, Bernard explained that the parties agreed to Page 6 in September 2013

when he joined First Star.  He recalls meeting with Rob Hendricks of First Star to fill out

paperwork and discuss a non-solicitation agreement:

…So, I was like, wait man, what's this?  He was like, oh, nothing, man, this is just to protect First Star, you know, to make sure you don't go after their customers, make sure you don't try to, you know, get their agents or their staff.  Then we came to the question, I'm like, okay, that makes sense, that's fair.  I said, what about customers I get while I'm at First Star, are those my customers?  He said, yes.  And I said, so if I ever leave, those customers can come with me? And he said, yes.  And that's where we had our little paragraph.  And that was about it.

4

(Bernard Dep., Doc. 49 at PageID 2474–75.) Bernard testified the parties agreed to define commissions at 65% and included two handwritten paragraphs on Page 6, between which Hendricks signed. (Bernard Dep., Doc. 49 at PageID 2474–75.) Bernard testified that he witnessed Hendricks sign his name in the middle of two handwritten paragraphs on Page 6. (Bernard Dep., Doc. 49-1 at PageID 2475.) Bernard did not receive a copy of the signed agreement at the time. (*Id*.)

Hendricks was asked at his deposition about his signature appearing on Page 6. Hendricks recalls meeting with Bernard to discuss his commission percentage but testified that he did not sign an agreement with Bernard. (Hendricks Dep., Doc. 45 at PageID 1961.) When asked about his signature purportedly appearing on Page 6, he testified: "It's my signature, but I didn't sign in the middle of that document." (*Id*.)

### C. Proposed Third Sales Agent Agreement

At the end of December 2015, Bernard formed a Florida-based Ohio limited liability company called Bernard Global Enterprises, LLC ("BGE"), of which he is the sole member. (Bernard Dep., Doc. 49 at PageID 2478.) Bernard claims he formed BGE to save money on taxes and sought a new contract with First Star to ensure he would be paid to his LLC. (*Id*.) He obtained a blank template of First Star's Sales Agent Agreement from his brother, Brandon Knab, who was also an agent for First Star. (*Id*. at PageID 2478–79.) On February 16, 2016, Bernard signed a proposed Third Sales Agent Agreement ("Third Agreement"), listing BGE as the agent. (*Id.*; Doc. 4-3 at PageID 207–223.) He listed a commission rate of 70% in Schedule A, and Rose Acre Farm ("Rose Acre"), The Kunkel Co. ("Kunkel"), and Red River Valley Egg Farm as "Excluded Accounts" in Schedule B. (*Id*.) Although Bernard signed the Agreement, he

did not receive a signed copy back from First Star.  (Bernard Dep., Doc. 49 at PageID 2482.)
First Star maintains that it never executed the Third Agreement.  (Plaintiff's Interrogatory
Responses, Doc. 51-1 at PageID 2769.)

**D.  Bernard Negotiates a Contract with Competitor Matson**

As a sales agent for First Star, Bernard developed strong business relationships with two
key customers, Rose Acre and Kunkel.  (Bernard Dep., Doc. 49 at PageID 2480, 2511.)
According to Jeff Ayers, Vice President of Transportation of Rose Acre, and Anthony Morimoto,
Vice President of Kunkel, both companies were frustrated with First Star's accounting practices.
(Ayers Dep., Doc. 41-6 at PageID 1006, 1014–20; Morimoto Dep., Doc. 41-7 at PageID 1114,
1174, 1180, 1220–21; Bernard Dep., Doc. 49 at PageID 2480.)  In addition, Rose Acre
threatened ending its working relationship with First Star over how a cargo claim was handled.
(Bernard Dep., Doc. 49 at PageID 2480.)

In December 2015, Josh Seifert, Agent Recruiter for Matson, contacted Bernard to
discuss working for Matson, and Bernard began seriously considering the possibility.  (Bernard
Dep., Doc. 49 at PageID 2494; Exhibit 14 to Bernard Dep., Doc. 66-2 at PageID 3011–14.)
Seifert testified that one of his first inquiries as a recruit would be whether an agent has
restrictive covenants.  (Seifert Dep., Doc. 47 at PageID 2175.)  He inquired as to whether
Bernard had restrictive covenants, and Bernard verbally told him he had none.  (*Id*. at PageID
2183.)  After that, "[t]here really wasn't much follow-up.  I mean, I had asked him a pretty
straight forward question, and he responded with a straight forward answer, and that was the end
of it."  (*Id*.)

In an email on January 14, 2016 from Seifert to Bernard, Seifert explained that Matson
would review his account list to "determine if there are any conflicts and establish credit" before

6

he joined Matson.  (JS Exhibit 10, Doc. 66-5 at PageID 3135.)  "That way you know when you come on board that your customers are coded to you and you have the credit you need."  (*Id*.) According to Matson's Vice President, Mark Christos, credit is a key component of the shipper-broker relationship.  (Christos Dep., Doc. 48 at PageID 2314.)  Typically, Matson tries to establish credit with prospective accounts "because the agent would need to know – if we're not going to grant credit to anybody, then there would be no need to enter into any sort of relationship because it would be fruitless."  (*Id*.)

On February 1, 2016, Bernard revealed to Seifert his gross profit and profit margin at First Star.  (Exhibit JS Exhibit 10, Doc. 66-5 at PageID 3143.)  The following day, Seifert emailed Bernard about the steps he needed to complete before he could secure an offer to join Matson.  (Exhibit JS 11, Plaintiff's Exhibit 16, Doc. 66-5 at PageID 3147.)  Seifert attached a copy of the agent application and a confidentiality agreement.  (*Id*.)  He also requested: a commissions report showing revenue/margin reporting, Bernard's customer list with names, addresses and phone numbers, and a current agent agreement to review or a written statement if there was no agreement or non-compete in place.  (*Id*.)  Seifert said: "[w]e will begin checking your accounts for conflicts, and establishing credit, that way you know if you come on board that those accounts are good to go."  (*Id*.)  Bernard responded to Seifert's email with a list of customers, including how many loads he was doing for them, their profit margin, and their current and future credit amounts.  (*Id*. at PageID 3145.)

On February 16, 2016, Seifert emailed Bernard, "Great news! We were able to meet your requested credit limits" based on the company's available financial information.  (JS Exhibit 19, Doc. 66-5 at PageID 3163.)  On February 23, 2016, Seifert requested that Bernard "request Kunkel to fill out our credit application" and request Red River Valley Egg if it is a standalone

company to fill out its credit application with trade reference and bank information.  (*Id.* at PageID 3165.)  That same day, Bernard emailed Ayers with an attached credit application and informed him, "I'm most likely going to be transferring my business to Matson soon.  Before I do so I want to make sure I don't have any issue with Matson getting RRVEF credit."  (Exhibit JX 21, Plaintiff Exhibit 17, Doc. 66-5 at PageID 3167.)

On March 2, 2016, Bernard entered into an Agent Agreement with Matson.  (Plaintiff Exhibit 11, Doc. 66-2 at PageID 3001–10.)  Rose Acre and Kunkel stopped doing business with First Star around the time Bernard joined Matson.  The last load transported for Kunkel occurred on March 3, 2016, and the last load transported for Rose Acre occurred on March 4, 2016.  (Plaintiff's Response to Interrogatories, Doc. 51-1 at PageID 2770.)  However, First Star did not become aware that Bernard and BGE were no longer providing services for First Star until May 2016.  (*Id.* at PageID 2767.)

Ayers, on behalf of Rose Acre, testified at his deposition that he was frustrated with First Star's handling of a cargo claim and billing issues.  He testified that "[h]ad it not been for Justin Bernard, we would have already stopped doing business with First Star" and that "[h]ad Justin not left, we would have eventually stopped doing business with First Star."  (Ayers Dep., Doc. 43 at PageID 1734.)  He was exclusively responsible for Rose Acre's decision to stop doing business with First Star.  (*Id.*)

Morimoto testified that Kunkel's relationship with First Star ended after Bernard left.  (Morimoto Dep., Doc. 46 at PageID 2058.)  However, he was not aware that Bernard left First Star until he noticed he was corresponding with Bernard at a Matson email address.  "Through one of our conversations he said – I said, hey did you get my e-mail?  He goes, and he told me, I

have a new e-mail address. . . So that's how I knew he was with a new company." (*Id.*) Kunkel did not experience any slowdowns as a result of the change. (*Id.*)

### E. Procedural History

Originally filed in the Hamilton County Court of Common Pleas, this case was removed to federal court on November 9, 2016. (Doc. 1.) Plaintiff asserts the following causes of action in its First Amended Complaint: (1) breach of the 2013 Agreement and Restrictive Covenant by Bernard and BGE; (2) tortious interference with business relationships by Bernard and BGE; (3) tortious interference with contracts by Matson; (4) tortious interference with business relationships by Matson; (5) misappropriation of trade secrets by Bernard, BGE, and Matson; (6) declaratory judgment; and (7) injunctive relief. (Doc. 4.) Bernard and BGE assert a counterclaim of tortious interference with contractual and business relationships against First Star. (Doc. 15.)

On March 1, 2018, Matson filed a motion for summary judgment against First Star on the three claims asserted against it: tortious interference with contracts, tortious interference with business relationships, and misappropriation of trade secrets. (Doc. 41.) Defendants Bernard and BGE "incorporate[d] by reference" the Matson motion for summary judgment and request[ed] summary judgment on all claims asserted against them, "[i]ncluding but not limited to Count I (breach of contract) and Count II (tortious interference)…" (Doc. 42 at PageID 1724.)[3] Plaintiff moved for partial summary judgment as to liability only on Counts I–VI of the First Amended Complaint and Bernard's and BGE's counterclaim in its entirety. (Doc. 51.)

---

[3] Bernard's and BGE's Motion for Summary Judgment is perfunctory and does not include substantive analysis or an attached Memorandum in Support with citations to legal authority. The Bernard Defendants' basis for summary judgment is based entirely on the "arguments set forth in Defendant Matson Logistics Services, LLC's Memorandum in Support of Motion for Summary Judgment." (*Id.*) First Star asks the Court to deny the Motion on

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden of showing that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  Pursuant to Rule 56(c)(4), "an affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).   The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could

---

this basis alone, as it fails to set forth independent bases as to the claims set forth against them.  The Court agrees. The filing is insufficient to support summary judgment and will be **DENIED.**

reasonably find for the [nonmoving party]." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991)). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft,* 929 F.2d at 248 (citing *John v. State of La. (Bd. of Tr. for State Coll. & Univ.*), 757 F.2d 698, 705 (5th Cir. 1985)).

## III.   ANALYSIS

Because cross-motions for summary judgment are before the Court, it will consider the motions jointly by claim, starting with breach of contract.

### A.  Breach of Contract by Bernard and Bernard Global Enterprises

First Star argues it is entitled to summary judgment on its breach of contract claim, arguing that Bernard and BGE breached the First Agreement. (Doc. 4; Doc. 4-1.) Responding in opposition, Bernard and BGE state that to avoid unnecessary briefing and in light of limited resources, they incorporate by reference the arguments set forth in Matson's opposition memorandum, which does not directly address the breach of contract claim against Bernard and BGE. (Doc. 56.) Although Defendants have not substantively addressed the breach of contract claim, the Court finds that obvious issues of fact nonetheless preclude summary judgment for First Star on this claim.

In moving for summary judgment, Plaintiff must show: (1) the existence of a contract; (2) performance by the Plaintiff; (3) breach by the Defendants; and (4) damage or loss to the Plaintiff. *Thomas v. Publishers Clearing House, Inc*., 29 F. App'x 319, 322 (6th Cir. 2002) (citing *Doner v. Snapp,* 98 Ohio App.3d 597, 649 N.E.2d 42, 44 (1994)). Summary judgment on a breach of contract claim is not appropriate if there is a dispute over what provisions are included in the contract, including the number of pages in the contract. *See Cox v. Priority Am.*, No. 1:03-cv-679, 2006 WL 3097186, at *6 (S.D. Ohio 2006) (denying summary judgment on breach of contract claim where there was a dispute over the number of pages of the contract).

Genuine issues of fact preclude summary judgment here. The breach of contract claim pled in the Amended Complaint is based upon a contract that is missing a page. Rather than admit Page 6 is the missing page, First Star argues the Court could merge the First Agreement and Second Agreement but exclude the handwritten portion of Page 6. First Star also argues that the Court could consider the parties' course of dealings in that First Star paid Bernard a 65% commission rate.

First Star's arguments are not persuasive because there is a material dispute of fact as to whether there was a complete contract and what that contract contained. Bernard testified that the parties made changes to the First Agreement and memorialized them in writing, and Hendricks confirmed his signature appears on the missing Page 6. Yet Hendricks also testified that he did not sign Page 6. If included, Page 6 contains contradictory language to many of the provisions in the First Agreement. The Court finds that resolving this dispute will hinge upon the credibility of witnesses and their testimony at trial. As such, Plaintiff is not entitled to summary judgment on its breach of contract claim.

### B. Declaratory Judgment

First Star seeks declaratory judgment that: (1) the second handwritten paragraph on Page 6 is not binding because First Star did not consent to it; (2) the second paragraph on Page 6 does not apply to customers Bernard developed during his agency relationship with First Star; and (3) the Third Agreement is not binding because First Star did not execute it. First Star argues that contract interpretation is a matter of law where the contract's terms are clear and unambiguous. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) ("Under Ohio law, contract interpretation is a matter of law when a contract's terms are clear and unambiguous.").

As previously discussed, the existence of the contract itself is in dispute. Without resolving the fact issues surrounding the existence of an enforceable contract, declaratory judgment as to the terms of such a contract is premature.

### C. Tortious Interference with Contracts by Matson

Both Matson and First Star move for summary judgment on First Star's tortious interference with contract claim against Matson. Under Ohio law, tortious interference with contract requires proof of the following elements: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Bridge v. Park Nat'l Bank*, 179 Ohio App. 3d 761, 766, 903 N.E.2d 702, 706 (2008) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 172, 707 N.E.2d 853 (1999)). In order to prevail on this claim, a party must demonstrate that the wrongdoer intentionally and improperly interfered with its contractual relations with another. *Dryden v. Cincinnati Bell Tel. Co.*, 135 Ohio App. 3d 394, 400, 734 N.E.2d 409, 413 (1999). As discussed, the existence of a contract is a factual dispute. As such, summary judgment on this claim is inappropriate.

### D. Tortious Interference with Business Relationships

Matson and First Star move for summary judgment on the tortious interference with business relationship claim against Matson. First Star also moves for summary judgment on the tortious interference with business relationship claim against Bernard and BGE.

"The tort of interference with a business relationship occurs when a person, without privilege to do so, induces or otherwise purposefully causes a third person not to enter into or continue a business relationship with another." *Gentile v. Turkoly*, 2017-Ohio-1018, ¶ 24, 86 N.E.3d 991, 997 (Ohio Ct. App. 2017) (citing *DK Prods., Inc. v. Miller*, 12th Dist. No. CA2008-05-060, 2009-Ohio-436, 2009 WL 243089, ¶ 9 (Ohio Ct. App. 2009)). "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Id. (citing First-Knox Nat'l Bank v. MSD Prop., Ltd.*, 2015-Ohio-4574, 47 N.E.3d 490, ¶ 19 (Ohio Ct. App. 2015)).

In moving for summary judgment against Bernard and BGE, First Star asserts that Bernard and BGE were aware of First Star's business relationship with Rose Acre and Kunkel because those relationships were developed while Bernard was an agent of First Star. First Star did business with Rose Acre until March 4, 2016 and with Kunkel until March 3, 2016. Bernard informed Matson of its relationship with those customers. After becoming an agent of Matson, Bernard and BGE assisted Rose Acre and Kunkel in transferring their business to Matson.

In moving for summary judgment against Matson, First Star argues that Matson was aware of First Star's business relationship with its customers because Bernard and BGE told Matson about the relationships before leaving First Star and Matson intentionally recruited

Bernard and BGE to become agents of Matson. During the recruitment process, Matson solicited and obtained its confidential information about its customers.

Matson argues that Rose Acre and Kunkel would have left First Star without Bernard joining Matson, and thus no causation can be established. In support, Matson relies upon *Casale v. Nationwide Children's Hospital* for the proposition that "'[i]t is an essential element in an action for tortious interference that the alleged interference bear a causal relationship to the breach or nonperformance of the' business relationship." No. 2:11-cv-1124, 2012 WL 13024407, at *4 (S.D. Ohio Aug. 2, 2012) (citing *Contadino v. Tilow,* 68 Ohio App. 3d 463, 468 (1990) (tortious interference with contractual relationship); *Smith v. Ameriflora 1992, Inc.,* 96 Ohio App. 3d 179, 188, 644 N.E.2d 1038 (1994) (tortious interference with business relationship)). Matson argues that the facts in this case are similar to those of *Charles Gruenspan Co., LPA v. Thompson*, where the court found no interference with a business relationship claim because the relationship between an attorney and clients began disintegrating well before new counsel became involved. No. 80748, 2003 WL 21545134, at *4 (Ohio Ct. App. 2003). Notably, however, the new counsel submitted a sworn statement into evidence attesting that he did not solicit his clients' business. *Id*. Although Rose Acre and Kunkel expressed frustrations with First Star that predated Bernard's leaving, the facts are not as clear as in *Charles Gruenspan*.

Matson also argues that the facts of this case are like those of *Stilson & Associates, Inc. v. Stilson Consulting Group, LLC*., where the Court of Appeals found that the district court correctly entered judgment in favor of the defendants on a tortious interference with business relationship claim. 129 F. App'x 993, 999 (6th Cir. May 6, 2005). The district court relied upon evidence that defendants were dissatisfied with the plaintiffs' work and would have gone

elsewhere for future projects regardless of the defendants, as well as a lack of evidence that the defendants solicited the breach of agreements with the plaintiffs or otherwise acted improperly. *Id.* The Sixth Circuit found that "[d]efendants cannot be said to have *caused* the termination of the relationship. Plaintiffs argue that [d]efendants' willingness to contract with the City – which allegedly enabled the City to end its relationship with [p]laintiffs – suffices to render them liable. Plaintiffs, however, provide no authority for this contention, and we find it unpersuasive." *Id*.

The Court finds that the evidence in this case regarding what caused Rose Acre and Kunkel to immediately cease their business relationship with First Star is mixed, distinguishing the facts here from the record in *Charles Gruenspan* and *Stilson* at this juncture. There is evidence that Rose Acre and Kunkel were frustrated with First Star and would have discontinued their relationships with First Star, but there is also evidence that Bernard and/or BGE seamlessly transferred business over to Matson immediately upon joining Matson. Those customers thus may have stayed with First Star for some period had Bernard not left. As issues of fact preclude summary judgment, this claim will proceed to trial.

### E. Misappropriation of Trade Secrets

First Star and Matson move for summary judgment on the misappropriation of trade secrets claim, but questions of fact preclude summary judgment at this stage. In order to prevail on a misappropriation of trade secret claim, the plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Hoover Transp. Serv., Inc. v. Frye,* 77 F. App'x 776, 782 (6th Cir. 2003) (citing *GTI Corp. v. Calhoon*, 309 F. Supp. 762, 767 (S.D. Ohio 1969)). A "trade secret" under Ohio law is defined as:

information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* (citing Ohio Rev. Code § 1333.61(D)).

The Ohio Supreme Court has adopted a six-factor test to help determine the existence of a trade secret: "(1) [t]he extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e*., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.,* 687 N.E.2d 661, 672 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592 (Ohio Ct. App. 1983)).

First Star argues the following are trade secrets: identity of First Star's customers, contacts, and the needs of those customers; the identity of First Star's potential customers; First Star's service methods, processes, procedures, and pricing; First Star's training methods and information; First Star's sales and marketing information and strategies; and the operation and application of First Star's automated systems. (Doc. 4 at PageID 164–65.) First Star Executive Vice President, Todd Hammerstrom, attests in his Affidavit that "First Star's customer list and associated customer information, which includes but is not limited to customers' names, contact information, credit worthiness and credit limits, and volume of business is confidential and trade

17

secret information." (Doc. 51-2 at PageID 2800.) He attests that First Star has expended significant time, effort, and expense to develop this information, which includes recruiting, training and guidance to employees and agents and the maintaining First Star's customer relationships. (*Id.* at PageID 2801.) He attests that this information would be valuable to competitors because it is not available to the public and would require significant time, effort, and expense for competitors to develop it on their own. (*Id.*) First Star protects this information with electronic, physical, and procedural safeguards including computer safeguards such as firewalls and data encryption and restricting physical access to First Star's business location with keycards. (*Id.*) First Star also password protects automated systems and requires employees and agents to enter into non-disclosure agreements. (*Id.*)

First Star also argues that its Sales Agent Agreement protects this information, although whether Bernard was subject to this agreement is a question of fact to be determined by the jury. Furthermore, this information was of at least enough value to Matson to allow Kunkel's business brokerage relationship to continue seamlessly without interruption or the company even noticing it was being serviced by a new company – Matson. First Star also notes that Matson considers similar information protectable trade secrets and has pursued litigation to that end. *See Matson Logistics Serv., LLC v. Smiens*, No. 12-400 ADM/JSM, 2014 WL 793708, at *8 (D. Minn. Feb. 27, 2014) (finding Matson's password-protected database containing identities of Matson's shippers, the revenue figures associated with those shippers, and the credit limits Matson set for those shippers to be a viable trade secret claim that survived summary judgment).

Although First Star's Amended Complaint defines its trade secrets broadly, the evidence in this case centers on Bernard conveying First Star's client list, customer credit information, and sales and profit margins to allow him to seamlessly do business with First Star customers after

18

switching to Matson. Ohio law recognizes that client lists may be trade secret. *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St. 3d 58, 64, 881 N.E.2d 850, 855 (2008) (memorized client list constituted a trade secret under Ohio law); *see Columbus Bookkeeping & Bus. Servs., Inc. v. Ohio State Bookkeeping, LLC*, 2011-Ohio-6877, 2011 WL 6938340, at *4–5 (Ohio App. Ct. 2011) (client lists were not protectable trade secrets). In *Columbus Bookkeeping*, the client list at issue was *not* entitled to trade secret protection, because the evidence did not indicate that the client list consisted of any information but the names of the entities that did business with the plaintiff and perhaps a billing address. *Id*. at *5. There was no evidence that the plaintiff maintained the secrecy of the identity of its clients. *Id*.

On the other hand, Matson argues that First Star has failed to demonstrate its alleged "trade secrets" are confidential, as opposed to publicly available and generic information. *See Brakefire, Inc. v. Overbeck*, 144 Ohio Misc. 2d 35, 878 N.E.2d 84, 95–97 (2007) (customer lists, price lists, financial documents, and training information were not trade secrets, as there was evidence that the defendants could have obtained the information by means other than through plaintiff's files). In *Brakefire*, the customer list in question contained information that could be obtained by going door-to-door and was widely available that it could be acquired through minimal efforts. *Id*. at 98. Similarly, Bernard testified that he developed his customers, Rose Acre and Kunkel, by "googling" the names of egg distributors. (Bernard Dep., Doc. 49 at PageID 2476.) Hendricks testified that agents did not receive formal training at the time Bernard joined First Star. (Hendricks Dep., Doc. 45 at PageID 1955–56.)

Matson also argues that the financial information conveyed was generic and forward-thinking based upon Bernard's own estimates. *See Telephone Management Corp. v. Goodyear*

*Tire & Rubber Co.*, 32 F. Supp. 2d 960, 974 (N.D. Ohio 1998) (generalized figures based on market were not the requisite business-specific information required to establish trade secret); *Heartland Home Finance, Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 862–63 (6th Cir. Jan. 7, 2008) (sales leads in question not protectible because they did not disclose any information about the competitor's business or its business plans).

"The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Hoover,* 77 F. App'x at 782 (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St. 3d 421, 492 N.E.2d 814, 819 (1986)). There is some evidence that First Star's customer list with location, loads, gross profit, and customer credit amounts may be company trade secrets, but there is also evidence that it was not specific information and was publicly available. The Court will allow this question to be determined by a jury, who should weigh and consider the evidence.

Matson argues that even if a First Star's client list and information are trade secrets, there is no evidence of misappropriation here. "Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
(a) Used improper means to acquire knowledge of the trade secret;
(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code Ann. § 1333.61(B).  First Star argues that Bernard was subject to the First Agreement which protected its trade secrets from disclosure.  First Star contends that Matson knew that Bernard was subject to an agent relationship with First Star but chose to ignore it and not inquire further despite seeking First Star information.  Seifert testified that there may be a copy of Bernard's agreement with First Star in his file with Matson.  (Seifert Dep., Doc. 47 at PageID 2183).  Yet, he also testified that he was not aware of a potential agreement until he received a cease and desist letter and that Bernard verbally told him he was under no agreement with First Star.  (*Id.*)

Whether Bernard was subject to an agreement remains a significant factual dispute that precludes summary judgment on this claim.   Even if he is not subject to an agreement, the jury may still consider that Bernard circulated a proposed agreement (the Third Agreement) between BGE and First Star containing restrictive covenants when it considers the evidence of misappropriation.

### F.  Tortious Interference with Contractual and Business Relations Against First Star by Bernard and BGE

First Star moves for summary judgment on Bernard and BGE's counterclaim against it for tortious interference with contractual and business relations.  The basis of this claim is that First Star knew that Bernard entered into Page 6 of the First Agreement and nonetheless pursued claims against him and BGE, which constitutes intentional interference with his contractual and business relationship with Matson.  Courts have recognized that the filing of a lawsuit by a party where the party lawfully seeks resolution of a dispute with another is privileged conduct that does not support a claim of tortious interference.  *See Ethicon Endo-Surgery, Inc. v. Crescendo Tech., LLC*., No. 1:07-cv-1016, 2008 WL 11351572, at *3 (S.D. Ohio May 7, 2008) (citing

*Caluder v. Holbrook,* No. C-990145, 2000 WL 98218, at *83 (Ohio App. Ct. 2000)).

Acknowledging this authority, Bernard and BGE respond that First Star's conduct is "egregious"

and "proves the exception."  (Doc. 56 at PageID 2838).  The Court disagrees and finds that the

privilege squarely applies.  As such, First Star is entitled to summary judgment on Bernard and

BGE's counterclaim.

## IV.    CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment filed by Matson

Logistics Services, LLC (Doc. 41) is **DENIED**; the Motion for Summary Judgment filed by

Defendants/Counterclaimants Justin Bernard and Bernard Global Enterprises (Doc. 42) is

**DENIED**; and the Motion for Partial Summary Judgment filed by Plaintiff First Star Logistics,

LLC (Doc. 51) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
Judge Michael R. Barrett
United States District Court